[No. 26022.  *En Banc.*  December 22, 1936.]

VELMA FRIEDA DAUGHERTY, *Respondent,* v. THE DE-
PARTMENT OF LABOR AND INDUSTRIES, *Appellant.*[1]

*The Attorney General* and *J. A. Kavaney, Assistant,*
for appellant.

*Gleeson & Gleeson,* for respondent.

GERAGHTY, J.—This appeal is from a judgment re-
versing an order of the joint board of the department
of labor and industries which denied the claim of
Velma Frieda Daugherty for a widow's pension on ac-
count of the death of her husband, Lewis Ray Daugh-
erty.

The husband's death occurred while he was engaged

[1] Reported in 63 P. (2d) 434.

in an extrahazardous employment, as defined by the workmen's compensation act. The joint board rejected the widow's claim for the assigned reason "that the death of Lewis Ray Daugherty was not the result of the injury alleged, nor was the injury the result of trauma." Reversing the finding of the joint board, the court entered a judgment for the payment of a pension to the claimant in her own right, as well as additional sums, at the statutory rates, for eight minor children, ranging in age from one to fourteen years. The case was tried to the court upon the certified departmental record and the oral testimony of six witnesses called by the department and one witness called in rebuttal by the claimant.

The husband was employed by the Panhandle Lumber Company as brakeman of a logging train, and it appears to have been part of his duties to assist in unloading the logs from the cars into the Pend Oreille river.

On the morning of his death, September 10, 1934, he reported for work at six o'clock. To what extent he assisted in unloading logs from a train of some eight or ten cars, on a siding at the river, is not clear from the testimony. After the logs were disposed of, and preparatory to the return of the train to the woods, the crew were engaged in "spotting" a box car at a supply warehouse, to be loaded with supplies for another camp. When the train had placed the box car in position at the warehouse, shortly after seven o'clock, the decedent proceeded to uncouple this car from the rest of the train. Eye witnesses testified that he stooped over the coupling as if intending to "cut the air" by uncoupling the air line; that he then suddenly stood up, lurched backward with his hands in the air, and fell to the ground. His wife, the claimant, had just come to the track with her husband's lunch, and

was accompanied by a friend, John Leland, who had stayed at the home of the couple the preceding night. They both saw the decedent fall, as did Mr. Young, an employee of the lumber company.

Shortly after his fall, the decedent was removed to the company's office and an ineffectual effort was made to revive him. He died in about fifteen minutes without having regained consciousness. In the fall, he sustained an injury to the back of his head, resulting in a flow of blood, but the subsequent post mortem examination disclosed that the bone was not injured.

The decedent was forty-seven years of age, apparently strong and accustomed to the hard labor required by his employment. Some two weeks prior to his death, he had visited Dr. Canning, a physician in the employ of the Panhandle Lumber Company. At the hearing before the joint board, Dr. Canning testified that the decedent complained to him of indefinite stomach distress and some weakness. His physical examination showed some tenderness in the abdomen, a slight enlargement of the heart, a systolic murmur, and some sclerosis, or hardening, of the arteries. In general, his condition was not then serious, and, in the opinion of the doctor, he might have lived an indefinite number of years.

It was the contention of appellant that death was the immediate result of these natural conditions and was not contributed to in any way by the work in which he was employed at the time; in other words, that he just dropped dead.

On the other hand, the claimant contends that, while "cutting the air" to uncouple the box car from the train, through his failure to turn one, or both, of the anglecocks, the pressure of air in the hose line, when cut, caused one of the ends, with the heavy iron coupling attached, to fly up and strike him on the chest,

the shock inducing the coronary thrombosis found by physicians to have been the immediate cause of death. It was also urged that the great physical exertion involved in unloading the logs, in view of his heart condition, could have caused the fatal attack.

In support of the contention that he was struck by the hose, it is shown that, when examined after the fall, there was an abrasion on his chest over the region of the heart. The claimant and the eye witness, Leland, testified that they saw the abrasion shortly after the fall, while the decedent was lying on the ground. It is uncertain whether his shirt was open at the time or whether it was unbuttoned by these witnesses. A trained nurse, the wife of one of the employees of the lumber company, had been immediately called to the scene. She testified that, in an attempt to revive the stricken man, she procured hot water bottles and applied one to his chest; that the bottle was wrapped with cloth but that, in removing decedent to the company office, the bottle slipped out of its wrapping and burned the chest. The trial court appears not to have been much impressed with the testimony of this witness, and, even on paper, it is not wholly convincing.

The court found as a fact, from the evidence, that, while decedent was uncoupling the air hose, he received a blow on the chest from the iron coupling that caused a bruise of from two to three inches, immediately over the heart; that, after receiving the blow, he staggered out from between the cars, stumbled, and fell to the ground with great force, cutting a gash on the back of his head; that he became unconscious and died fifteen minutes after the fall. The findings recite that the court did not believe the statements of the nurse, in so far as they undertook to show that the bruise was caused by the application of a hot water bottle. The court also found that the blow from the hose, with the

resulting fall to the ground, was sufficient to induce the coronary thrombosis.

As we have seen, at the trial to the court, in addition to the departmental record, the testimony of seven witnesses was received. In view of the conflict of the evidence as a whole, the case is one suggesting a presumption in favor of the trial court's finding. That the decedent died while in the immediate discharge of the duties of an extrahazardous employment, is admitted. It is true, of course, that he could have dropped dead at the precise moment when he was engaged in uncoupling the cars, as a result of the preexisting condition testified to by Dr. Canning. But, on the other hand, if there is any credible evidence or reasonable inference warranting a finding that the immediate work in which he was engaged was the direct cause, or an inducing cause, of his sudden collapse, the fact of his preexisting condition and its possibility should not outweigh justifiable inferences from the attendant circumstances.

The workmen's compensation law is intended to compensate for the hazards of employment. An element of this hazard to a workman not in perfect health or suffering from some progressive ailment, is the possibility that, in his impaired condition, he may be less able to withstand an untoward incident occurring in the course of employment. In this case, the workman, with a wife and eight small children to support, had no choice but to carry on. The act does not contemplate that its benefits shall be limited to those workmen only who can register a perfect physical score.

The facts here make at least as strong a case in favor of the claimant as those in *McKinnie v. Department of Labor & Industries,* 179 Wash. 245, 37 P. (2d) 218, and *Smith v. Department of Labor & Industries,* 179 Wash. 501, 38 P. (2d) 212. In the latter case, it

was held that, where a workman was afflicted with myo-carditis and was suddenly taken ill and died within a short time after unusual violent physical exertion in the performance of his duties, his death was due to an accident

". . . within the workmen's compensation act, where it appears that death was likely to follow excessive exertion, which was too great for one in his condition,"

and the court cited an English case, *Flanagan v. Ackers Whitely & Co.* (1926), 19 B. W. C. C. (Eng.) 399, saying:

"In that case, a mine employee, while working in the mine, found that a wheel of a tub had left the rail, and undertook to lift the wheel back on the rail. Thereafter, he complained of a pain in his chest and died the next day. The post-mortem showed that the heart was in a bad condition; that the walls were steadily and increasingly becoming thinner, and that death was due to the fact that the right auricle had burst. There was medical testimony to the effect that the lifting of the weight *might have caused* the condition that produced death. The court held that the evidence was sufficient to justify an award for the claimant."

While the blow from the air hose, found by the court, might not have been sufficient, in the case of a man in normal health, to have caused death, yet, as testified by medical experts, it could, in the weakened condition of decedent's heart, have caused death.

In *McKinnie v. Department of Labor & Industries, supra,* it was held that the death of the workman was accidental, as resulting from excessive effort in pulling on the mooring line of a vessel, from the effects of which he died nine days later. There, the workman had suffered from hardening of the arteries, but there was medical testimony indicating that the immediate

cause of death was mesenteric thrombosis, induced by physical effort.

To the same effect is *Metcalf v. Department of Labor & Industries,* 168 Wash. 305, 11 P. (2d) 821, where we said:

"Had Mr. Metcalf's violent efforts sawing the log, in an attempt to clear the road for Mr. Benson's passage, resulted in a sprained wrist, a torn tendon or a dislocated shoulder, any one of those injuries would clearly have been

" '. . . a sudden and tangible happening of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical condition as results therefrom.'

"The fact that his arteries had so hardened that death was likely to result 'from a sudden and tangible happening of a traumatic nature,' does not deprive Mr. Metcalf's widow and minor child of their right to statutory benefits. It was not the legislature's purpose to limit the provisions of the workmen's compensation act to only such persons as approximate physical perfection."

The judgment is affirmed.

MAIN, MITCHELL, HOLCOMB, BEALS, and BLAKE, JJ., concur.

TOLMAN and STEINERT, JJ., dissent.

MILLARD, C. J. (concurring in the result)—Plaintiff's husband died at Ruby, Washington, September 10, 1934, while engaged in extrahazardous employment as a brakeman on a logging railroad. Plaintiff's claim for pension was denied by the supervisor of the department of labor and industries, on the ground that the death of the claimant's husband was not the result of an injury, as defined by the workmen's compensation act. A hearing before the joint board on the claimant's petition resulted in affirmance of the supervisor's order of rejection. From that decision, the

claimant appealed to the superior court for Spokane county where a trial was had to the court, which resulted in findings, conclusions and a judgment reversing the order of the joint board. The department appealed.

The cause was submitted upon the testimony of seven witnesses called by the department. While the departmental record of the cause was certified to the superior court, that record was not incorporated in, or filed as a part of, the statement of facts which the trial court certified

". . . contains all the material facts, matters and proceedings heretofore occurring in said cause and not already a part of the record therein, and contains all the evidence, oral and in writing therein . . ."

The statement of facts recites that the court stated at the beginning of the trial of the cause, "The record has been certified here by the department." In the statement of facts is a statement that, at the beginning of respondent's case in chief,

"The testimony taken on rehearing before the joint board on May 8, 1935, was then read to the court, the testimony of the lay witnesses having been read first, followed by the testimony of the doctors."

Although the testimony read to the court may have been a portion of the departmental record, the record was not, by reference, made a part of the statement of facts, nor has it been certified by the trial court as a part of the statement of facts.

This appeal presents only questions of fact. That being so, this court may not say that the judgment of the trial court is wrong, as there is not before this court all the evidence upon which the trial court passed judgment. In *Simmons v. Department of Labor & Industries,* 175 Wash. 290, 27 P. (2d) 567, the department appealed from a judgment of the superior court re-

versing a decision of the department. In that case, as in the case at bar, the departmental record was certified to the superior court. The department failed to have the trial court certify the departmental record as a statement of facts, and did not have certified and filed a bill of exceptions. Respondent's motion to dismiss the appeal and affirm the judgment was granted. We said:

"We have repeatedly held that we will not in any case say that the judgment of the trial court is wrong upon questions of fact unless we have before us all the evidence upon which that court passed judgment, and that this fact must affirmatively appear from the record."

Although in the statement of facts there appears the trial court's certificate that it contains all the evidence, the statement of facts discloses that it does not contain all the evidence, and for that reason this court cannot consider the questions of fact presented by the appellant. *Moore-De Grazier & Co. v. Haas,* 53 Okla. 817, 158 Pac. 584.

The only question remaining is whether the findings and conclusions support the judgment. It is clear that the judgment is fully supported thereby. The judgment should be affirmed for the reason I have stated above.